CHIEF JUSTICE LINDSAY
delivered the opinion oe the court.
The Lexington & Big Sandy Railroad Company (Eastern Division), in addition to its corporate right to construct and operate a line of railway, has special authority to hold and own real estate, and to mine coal and other minerals, and to transport the products of its mines over branch roads, switches, inclines, and connections to its main line for shipment. Pursuant to this special authority the company opened, and has for some years been working, a coal-mine at Kilgore’s, in Boyd County. The entrance to this mine is two hundred and sixty-eight feet from the line of railway, and is connected with it by an inclined tramway of two tracks. The incline is one hundred and sixty-four feet in length, and the descent is at the rate of thirty-five feet in one hundred. There is a stretch of level track at the lower end of the tramway ninety-four feet in length. The elevation at the lower terminus is twenty-three feet above the bed of the main line of railway. Directly opposite the lower terminus, and sixty feet distant, there stands a small tenement-house, the property of the company, which, at the time of the injury herein complained of, was occupied as a residence by one Robert Claxton and family. Claxton was an employee of the company, and. occupied this house as its tenant.
In the year 1875 a car loaded with coal became detached from its fastenings, (by the breaking of an iron hook) when on the incline, and but a few feet from the entrance to the mine. It ran down the incline, and along the tramway to its lower terminus, and was precipitated over the twenty-three- *639 feet “tip" and then ran against the house of Claxton and killed instantaneously his wife and one of his children, who were at the time in the doorway fronting the railroad. The appellant was appointed the administrator of the deceased child, a boy six years of age. He instituted this action against the company to recover damages under the provisions of sections 1 and 3, chapter 57, General Statutes. He avers that his intestate was killed by appellee while pursuing its business as the proprietor of a railroad, and that the death was the direct result of the willful neglect of its servants and agents.
An issue on the question of negligence was formed by the pleadings, and after the evidence offered by the appellant had been heard, the court below instructed the jury to find for the company. The propriety of that ruling is now before this court for revision.
In Case’s adm’r v. the Railroad Co. (9 Bush, 728), in the construction of sections 1 and 3 of the act of March 10,1854, which were substantially the same with sections 1 and 3, chapter 57/General Statutes, it was held that the allegation of willful neglect, in an action pf this character, includes all inferior degrees of negligence, and that if the complainant fails to establish his right to punitive damages by proving willful neglect, he may, nevertheless, upon proof of culpable neglect, recover compensatory damages, if the defendant be the proprietor of a railroad, and the deceased was not at the time of the injury in his'or its employ. But we are satisfied the 1st section does not apply to the facts of this case. It is true the appellee is the proprietor of a railroad, and it is also true that the deceased was not in its employ at the time he was killed. But the proof shows that the work being carried on by the appellee, at the time and place the accident or killing occurred, was not in its nature or character incident to or part of the regular and usual business of the proprietor of a railroad.
*640 The legislature has seen proper to invest this company with a two-folcl character. For the purpose of constructing and operating a line of railway, it is a railroad company; but for the purpose of mining, and of delivering the products of its mines on the line of the railway for shipment, it is a mining company; and the tramway and cars in useaat the time the alleged negligent killing was done, are the usual and necessary attachments to mining operations, and were in no sense incidents to the railroad owned by the appellee. The agents and servants in charge of the tramway were engaged in mining operations, and not in managing, controlling, or operating the company’s railway. It follows, therefore, that while the appellant is able to bring his case within the letter of the section in question, it is evidently a case not contemplated by its provisions. There is no more reason why the appellee should be compelled to answer, as the proprietor of a railroad, for an injury caused by the negligent management of a tramway attached to its mines, than that it should be required to answer for the death of a party, resulting from the negligence of its agents or servants while engaged in prospecting for coal, iron, or other minerals on some of its lands wholly disconnected from and not even bordering on its line of railway.
But the third section of the act does not confine the right of recovery to cases in which the death results from the negligence of the servants or agents of proprietors of railroads. It provides, that if the life be lost or destroyed by the willful neglect of another person or persons, company or companies, corporation or corporations, their agents or servants, the widow, heir, or personal representative of the deceased shall have the right to sue and recover punitive damages for the loss or destruction of the life aforesaid.
This branch of the case presents two questions: Whether from the evidence, treating it all as true, and giving the appellant the benefit of every inference which can be fairly drawn *641 from the circumstances in proof, the jury could reasonably have found that the agents or servants of the company were guilty of willful neglect? and if so, whether it can escape liability under the statute, on the ground that the deceased was guilty of contributory negligence?
The fixtures and attachments of the tramway in use by the •company were not of the most modern and approved character. The wire rope intended to control the movements of the car, which broke loose at the time of the killing, was coiled on a drum that ought to have been and was not placed in or opposite to the center of the track. The consequence of this defective arrangement was that the wire did not uncoil in a direct line, and that the strain on the iron hook by which it was fastened to the car was much increased, and the hook thereby rendered more liable to be broken. There were no flanges or “elects” on the rim of the drum to prevent the wire rope from falling over its edge.
We are not prepared to say that, considering all these facts, the jury might not, with some show of reason, have concluded that the rope did fall over the edge of the drum, and that the iron hook was broken by the sudden strain or jerk resulting from the check thus given to the speed of the rapidly-descending car. Under ordinary circumstances the proof in question would establish nothing more than simple neglect by the company to use proper precautions to guard against injuries to persons who might be casually exposed to possible danger, and would fail to establish the degree of culpability mentioned in the statute. But it was further in proof that the company had made no provision whatever to arrest the progress of a car that might become detached from the wire ropes intended to control its movements, and that it was not only possible but usual to provide against such accidents by the. erection, at the lower terminus of an inclined tramway, of what is known as a “buffer.” One witness, a civil engineer, testifies that by *642 means of a “buffer” a locomotive running at the rate of ten miles per hour may be stopped without trouble or difficulty.
The jury might therefore have found that the company, with full knowledge of all these facts, persisted in the use of inferior machinery, and failed to have that properly arranged, and failed also to use reasonable precautions to provide against danger to the public, and especially to the inmates of the house leased by them to Claxton. The officers and agents of the company could not have been unaware of the danger to which the inmates of that house were constantly exposed; and yet the house was leased by the company to Claxton for the purpose of making profit out of the leasing, and the company still failed to use the usual and ordinary precautions to protect the inmates against a misadventure which might happen at any time. Under such a state of proof it was for the jury, and not for the court, to determine whether the company’s negligence was willful. (7 Bush, 235.) If it was willful in the statutory sense, then no negligence on the part of the deceased will operate to relieve the wrong-doer from civil responsibility. To make out a case under the statute, it must be shown that the conduct of the party in fault was such as to evidence reckless indifference to the safety of the public, or an intentional failure to perform a plain and manifest duty, in the performance of which the public or the party injured had an interest.
There must be such conduct as implies actual malice, or anti-social recklessness. (2 Duv. 557; 10 Bush, 667 and 263; 9 Bush, 532.)
And when this grade of negligence is established, the guilty . party must answer in damages, no matter how negligently the .person killed may have acted. This rule was distinctly announced in. the case of Mahoney’s adm’x (7 Bush, 235), on the authority of several preceding cases. It was followed in *643 the ease of Digby v. Kenton Iron Co. (8 Bush, 167), and recognized in the still later case of Jacobs’ adm’r (10 Bush, 272.)
This conclusion obviates the necessity for inquiring how far the negligence of a parent may be imputed to a child six years of age, in an action prosecuted by the child or its personal representative, to recover for a personal injury resulting from the negligence of the parties sued.
We are of opinion the court erred in taking the case from the jury, by the peremptory instruction to find for the appellee.
The court below erred in refusing to permit the witnesses Daviess, Forbes, and Dillon, to answer questions touching the quality and strength of iron out of which the broken hook was made. These witnesses showed themselves to be experts, and their opinions -were admissible as evidence. It also erred in refusing to permit Daviess and Forbes to state their opinions as to the comparative safety of the inclines in use by the company, at the time the deceased was killed. They were experts on this subject, and their evidence would have tended to show that the incline in use at Kilgore’s was inferior in plan, construction, and arrangement.
Judgment reversed, and cause remanded for a-new trial1 on principles consistent with this opinion.