Freda Nolan Spencer

*v.*

Howard Steinbrecher

(No. 12741)

Submitted October 1, 1968.     Decided December 10, 1968.

*Jenkins, Schaub & Fenstermaker, John F. Wood, Jr.,* for appellant.

*Kenneth H. Fisher,* for appellee.

BERRY, PRESIDENT:

This action was instituted in the Circuit Court of Cabell County by the plaintiff, Freda Nolan Spencer, against the defendant, Howard Steinbrecher, for the wrongful conversion of the plaintiff's 1957 Ford automobile. The jury returned a verdict in favor of the plaintiff in the amount of $400 compensatory damages and $10,000 punitive damages. The complaint asked only for $5000 as punitive damages and after the verdict the plaintiff moved the court to amend the complaint as to punitive damages in the amount of $10,000 to conform with the verdict. Before the court acted on this motion the plaintiff moved to be allowed to file a remittitur of $5000 and to have judgment entered for $5000 punitive damages. The court permitted the remittitur to be filed. The defendant's motion to set aside the verdict was then overruled by the court and judgment was entered for the plaintiff in the amount of $400 compensatory and $5000 punitive damages. On application to this Court an appeal was granted on March 25, 1968, to the judgment of the Circuit Court of Cabell County on December 20, 1967. The case was submitted for decision of this Court upon arguments and briefs of the respective parties at the September Regular Term 1968.

The case arose out of an automobile accident in Huntington, West Virginia, on August 19, 1965, in which the plaintiff's 1957 Fairlane Sedan automobile was struck in the

front end by another automobile while the 1957 Ford was being operated by the plaintiff's son. The son was taken to a hospital and the police department, under an agreement or contract with the defendant, had the plaintiff's car towed to the Economy Garage which was operated by the defendant. The plaintiff, after visiting her son in the hospital and ascertaining he was not seriously injured, learned from the police officers at the hospital where her car had been taken and several hours later went to the garage to determine what to do about it. Darrell Steinbrecher, a son of the defendant, at the plaintiff's request, prepared an estimate of the cost of the repair to the plaintiff's car in the amount of $250 by the Economy Garage. The damage done to the plaintiff's car in the accident was to the front end. Considerable damage was done to the left front fender and bumper. She was advised at that time that the frame had not been damaged.

The plaintiff, at the time she received the estimate for repairs to her automobile, did not have the money with which to pay for such repairs and negotiations extended over a period of several months with the defendant or his son with regard to repairing her automobile. There is a conflict in the evidence with regard to what was said relative to repairing the plaintiff's automobile during the period. The plaintiff's evidence was to the effect that an agreement was made that she would pay $100 down and $10 a month and that the down payment would not be due until the defendant had located used parts and of course if the car was repaired no storage charges would be made.

Some time after the discussion with regard to repairing the automobile the plaintiff stated that she told the defendant that she had seen a car like hers at a place not far away and suggested that he obtain the parts for the front end from that automobile. She stated that the defendant told her that the parts on the other car were rusted and that he did not want to put them on her car because it was in good condition. She testified that on several occasions she made it clear that she intended to have her car

repaired because she had a new motor installed about three months before the accident at a cost of $450.81. She also stated that she had purchased four tires not long before the accident at $36 apiece and had had new seat covers installed in the car.

Some months after the car was placed in the defendant's garage the defendant's son called the plaintiff and told her the repairs would cost $350; that they had taken the motor out and found that the frame was bent. At that time she told them to fix it anyway. She stated that the defendant or his son told her that he might get a front end off another wrecked car which he had located in order to repair her car. On this occasion the plaintiff stated she heard the defendant or his son talking with some person over the telephone indicating that they had sold some parts off her automobile, because the statement was made not to sell anything else as the car was going to be repaired.

The plaintiff stated that she intended to pay for the repairs when she got a refund from her income tax return and that when she did receive this refund, some time in April, 1966, which was for almost the same amount as the repair bill, she went to the defendant's garage and offered to pay for the repairs in accordance with the agreement but that they would not take the money. It appears that on some occasions prior to the time the plaintiff stated she offered to pay for the repairs to her car, the defendant or his son had called her and offered to buy the car.

An action had been instituted by the plaintiff against the parties causing the damage to her automobile in the accident and the plaintiff's son either offered to testify or did testify at the trial that her automobile was damaged in the amount of $350. She obtained a verdict for $350 but settled the claim for $300.

Apparently nothing was done with regard to repairing the plaintiff's automobile for several months after she made the offer to pay for the repairs from the tax refund she received, although she apparently expected the defen-

dant to make the repairs to her automobile. However, when her son went to the garage to look at the car he was unable to find it. The plaintiff then called the garage and was told that her car had been moved to another lot which was apparently a wrecking or salvage lot owned by the defendant under another name. She found her car on that lot, and it was in the process of being dismantled. The rear door was gone, the trunk lid removed, a wheel gone, glass broken, the radio was gone, wires in the car pulled out and the motor was not the one she had bought for the car because it had a different serial number.

The plaintiff then demanded an explanation from the defendant with regard to the matter at which time he stated at first that he did not know anything about her automobile. She then accused him of violating the law in selling parts from her car when he did not have a title at which time he replied that he did have a title. This caused considerable argument between them and the defendant then advised her that he had sold her car under a distress warrant. She demanded that the car be put back in the same condition it was in before the parts were removed.

It appears that the defendant's son made an affidavit before a justice of the peace on March 18, 1966, that he did not know who the owner of the plaintiff's car was and obtained a distress warrant for the sale of this car in the name of John Doe as the owner in favor of the defendant as owner of the Economy Garage, for storage and towing charges of $85, for a lien. A constable sold the plaintiff's car on March 28, 1966, to the Economy Garage for $85. The plaintiff knew nothing whatsoever about this entire transaction. The evidence shows that the defendant had caused numerous cars to be sold over a period of from 15 to 20 years under distress warrants by this same fictitious method. The cars would apparently be bought by him to satisfy alleged towing and storage charges. The plaintiff's evidence was corroborated in many instances by both her husband and her son.

The defendant's evidence contradicted that of the plaintiff in many respects and a witness who worked for the defendant but was on unfriendly terms with the plaintiff as her neighbor testified that the plaintiff had not offered the money to the defendant for the repairs to her car as she claimed but had merely promised to make such payment. Darrell Steinbrecher testified at the trial although his father, the defendant, did not. He stated that the plaintiff only made promises to pay for the repairs and that he had talked with her only over the telephone about one time. He stated that the plaintiff's car was worth about $75 or $100 at the time it was brought in after the accident and that he never saw the plaintiff between January and March, 1966; that he got the distress warrant for her automobile because he thought it had been abandoned. He denied that he told the plaintiff not to pay for the repairs until the parts were obtained for her automobile. He admitted obtaining this distress warrant and having the automobile sold under it. He also admitted selling the motor from the plaintiff's automobile for $50 as well as the radio for $7.50 and the wheels and tires for about $3 or $4 apiece; that he continued selling parts off the plaintiff's car until about two-thirds of it had been stripped; that he did not consider the motor which was practically new when hauled into the defendant's garage was worth very much because it had become rusted. He denied calling the plaintiff and raising the cost of the repairs although he admitted it would cost more than $250, the original price given for the repairs, and that he told her in May or June, 1966, after the car had been practically stripped that he would repair it for $350.

Darrell Steinbrecher testified that he is his father's partner, although it was stipulated at a pretrial conference order that the estimate of repairs to the plaintiff's automobile was issued by the defendant Howard Steinbrecher under the name of Economy Garage and the purported distress warrant was sworn out in the name of Howard Steinbrecher as owner of the Economy Garage. The purpose of the testimony concerning the partnership was an attempt to relieve the defendant from being liable for

punitive damages because it was claimed he was not responsible for what the other partner did with regard to the stripping of the plaintiff's automobile, the sale of the parts therefrom and the attempt to have it sold under a distress warrant.

The only statement in plaintiff's evidence before the jury with regard to value of plaintiff's automobile in the wrecked condition in which it was placed in defendant's custody, which was objected to by the defendant, was the statement by the plaintiff in the following language: "Well, I imagine it was—with a new motor and everything I imagine it would be worth wrecked four or five hundred dollars, anyway." No person engaged in the business of buying or selling automobiles or otherwise qualified to testify as to the value of automobiles was used by the plaintiff during the trial as a witness although her son and her husband each avowed out of the presence of the jury that in their "opinion" it was worth about $350 or $300 without showing any experience to qualify them as evaluator. A used car dealer in somewhat the same business as the defendant testified for the defendant and said the plaintiff's automobile was worth about $50.

The errors relied on by the defendant for reversal can be consolidated in three categories as follows: (1) That the court erred in permitting the plaintiff to testify with regard to the value of her automobile and there was no proof of the value of the car to support the verdict of the jury; (2) that the amount of punitive damages awarded by the jury was out of proportion to the compensatory damages awarded by the jury; (3) that it was reversible error to give plaintiff's instruction number 6.

The general rule with regard to proof of damages is that such proof cannot be sustained by mere speculation or conjecture. *Newman* v. *Robson & Prichard*, 86 W. Va. 681, 104 S. E. 127; 5 M. J., Damages, §13. Property damage can usually be proved with greater exactness than other types. Certainly the statement by the plaintiff that she "imagined" her car was worth a certain amount after the wreck is not proper proof of value from which damages

for its later destruction could be ascertained. *Cato* v. *Silling,* 137 W. Va. 694, 73 S. E. 2d 731, cert. den. 348 U. S. 981, rehearing denied 349 U. S. 924. It was held in the third point of the syllabus of the case of *Rodgers* v. *Bailey,* 68 W. Va. 186, 69 S. E. 698, that: "In proving compensatory damages, the standard or measure by which the amount may be ascertained must be fixed with reasonable certainty, otherwise a verdict is not supported and must be set aside." There is no reason why an owner cannot testify as to values of his own personal property, but he must, in order to avoid speculation, have enough experience to know values and be able to tell why, so the more frequent method of proof is to have the value testimony produced by persons experienced with the type of property involved. Frequently, the cost of repairs may be equal to the difference in market values. In this present case the defendant dismantled a car that was already damaged so plaintiff would first have to prove the value at the time the defendant got the car in order to establish the damage the defendant did in destroying it.

The proper method of proving damages for destruction is to ascertain the market value of the property at the critical time, such as the time of destruction. *Mullins* v. *Baker,* 144 W. Va. 92, 107 S. E. 2d 57; *Butler* v. *Smith's Transfer Corp.,* 147 W. Va. 402, 128 S. E. 2d 32. In addition, of course, plaintiff is usually entitled to necessary reasonable expenses directly resulting from defendant's action, but no substantial evidence was adduced as to any such items. In the case at bar, the time the wrecked car was placed in the custody of the defendant was so near that of the time after the accident that the values could be assumed the same without change.

In the instant case inasmuch as there was evidence that the plaintiff had received a verdict for $350 damages done to her automobile in the accident and a final estimate of the cost to repair the damages inflicted in the accident was also $350, the easy way of establishing the true value of the plaintiff's automobile for the purpose of proving damages committed by Steinbrecher would be the market value

at the time it was placed in the defendant's garage, which would be the value just before it was wrecked, less $350. There is a complete absence of any evidence following this or any reasonable alternative procedure, just a mere guess on the part of an inexperienced plaintiff as to the value of the car after the wreck. For a good statement of the rule about proving damage to personal property not destroyed, see *Cato* v. *Silling*, 137 W. Va. 694, 73 S. E. 2d 731.

The punitive damages of $10,000 found by the jury would appear to indicate prejudice on the part of the jury because the amount does not have a reasonable relationship to the compensatory damages. The rule in this State with regard to punitive damages is that such damages must bear a reasonable proportion to the compensatory damages. *Ennis* v. *Brawley*, 129 W. Va. 621, 41 S. E. 2d 680; *Raines* v. *Faulkner*, 131 W. Va. 10, 48 S. E. 2d 393; *Toler* v. *Cassinelli*, 129 W. Va. 591, 41 S. E. 2d 672.

The rule relating to punitive damages is clearly stated in point 3 of the syllabus in the case of *Toler* v. *Cassinelli*, *supra*, and followed in the *Ennis* v. *Brawley*, *supra*, case, in the following language: "A finding of compensatory damages by a jury is an indispensable predicate to a finding of exemplary or punitive damages, and damages awarded by way of punishment must bear a reasonable proportion to compensatory damages so found."

Although it appears that the punitive damages do not bear a reasonable proportion to the compensatory damages in the case at bar we do not intend to say that punitive damages are not warranted in the instant case. Good faith was not shown in the attempt to sell the plaintiff's car under a distress warrant, and other actions on the part of the defendant and his son in dealing with the plaintiff over a period of months leading her to believe that her car would be repaired while at the same time dismantling and selling parts therefrom would be sufficient aggravating circumstances to support such damages. *Mayer* v. *Frobe*, 40 W. Va. 246, 22 S. E. 58; 5 M. J., Damages, §66. The distress warrant used in an attempt to dispose of

plaintiff's automobile was clearly an improper practice and the fact that the defendant had used the same procedure on other occasions makes the matter even worse. The distress warrant was void ab initio and would have no effect whatsoever in disposing of the plaintiff's property. The attempt by the defendant's son to rely on legal advice from a justice of the peace to warrant such procedure is without merit and, of course, would in no way be a defense even if the defendant Howard Steinbrecher so relied. See Catzen v. Belcher, 64 W. Va. 314, 61 S. E. 930.

The defendant attempted to be relieved of punitive damages by having his son claim that he is a partner in the business and defendant asserted that he is not liable for punitive damages caused by actions on the part of his partner. The evidence in this case indicates that the defendant actively participated in and approved the treatment accorded to the plaintiff with regard to her automobile and the attempted disposal thereof. It is clear that he knew of all the transactions and even if his son was a partner he would be liable for punitive damages. See Code, 47-8a-13, 14, as amended. Myers & Co. v. Lewis, 121 Va. 50, 92 S. E. 988.

Then, too, the parties entered into a stipulation at a pretrial conference that certain actions involved in the instant case were done by the defendant under the name of Economy Garage and they are bound by such stipulation. Butler v. Smith's Transfer, supra.

Plaintiff's instruction number 6 given in this case and objected to by the defendant contains the following language in the second paragraph: "Punitive or exemplary damages are damages in excess of the compensatory damages which are awarded to punish the Defendant and to serve as a warning to the Defendant and others not to repeat or commit similar wrongs."

It has been held that punitive damages are not in excess or addition to compensatory damages but are awarded in connection with such damages. The second paragraph of instruction number 6, in order to conform to the rule of punitive damages should have read substantially as follows:

"Punitive or exemplary damages are damages which together with and in reasonable proportion to the amount of compensatory damages will punish the defendant and in the judgment of the jury be sufficient to deter others from engaging in like course of conduct."

Inasmuch as instruction number 6 did not conform to the rule for punitive damages adhered to in this state it was reversible error to give this instruction.

For the reasons stated herein, the judgment of the Circuit Court of Cabell County is reversed, the verdict set aside and a new trial is awarded to the defendant.

*Judgment reversed; verdict set aside; new trial awarded to defendant.*